1
2
3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO.  19-20123-CR-MORENO/Goodman

4     UNITED STATES OF AMERICA,

5                        Plaintiff,

6          vs.

7                                          Miami, Florida
                                           April 11, 2019
8     GASPAR ISAUL HUERTA ESTRADA and       Pages 1-31
      CARLOS ANTONIO DURAN HERNANDEZ,

9

10                     Defendants.
      _____

11              TRANSCRIPT OF PRETRIAL DETENTION HEARING
                BEFORE THE HONORABLE JONATHAN GOODMAN
12                 UNITED STATES MAGISTRATE JUDGE

13

14    APPEARANCES:

15    FOR THE PLAINTIFF:
                          *United States Attorney's Office*
16                        BY:  TIMOTHY ABRAHAM, A.U.S.A.
                          99 Northeast Fourth Street
17                        Miami, Florida 33132

18    FOR DEFENDANT HUERTA ESTRADA:
                          *Federal Public Defender's Office*
19                        BY:  ELIZABETH BLAIR, A.F.P.D.
                          150 West Flagler Street
20                        Suite 1700
                          Miami, Florida 33130

21

22    FOR DEFENDANT DURAN HERNANDEZ:
                          *Pinera-Vazquez Law Firm*
23                        BY:  SYLVIA BEATRIZ PINERA-VAZQUEZ, ESQ.
                          International Center
24                        1900 Southwest 3rd Avenue
                          Miami, Florida 33129

25

PROCEEDINGS RECORDED BY DIGITAL AUDIO RECORDING
TRANSCRIPT PRODUCED BY MANUAL STENOGRAPHY
AND COMPUTER-AIDED TRANSCRIPTION

<pre>
 1   TRANSCRIBED BY:     DAWN M. SAVINO, RPR
                        Official Court Stenographer
 2                      400 N. Miami Avenue, 10S03
                        Miami, Florida  33128
 3                      Telephone:  305-523-5598
</pre>

---

                          P-R-O-C-E-E-D-I-N-G-S

5          THE COURT:  So now we go back to the two matters that

6   were left over from this morning, the pretrial detention hearing

7   starting on Page 9 Gaspar Huerta Estrada, and Page 10, Carlos

8   Duran Hernandez.

9          All right.  Well folks, I've just been told that I have

10  a grand jury here and I always -- I do have a grand jury here.

11  While I'm not going to postpone this until they get here,

12  sometimes they're here in two minutes, sometimes they're here in

13  20 minutes.

14         All right.  So who's here for Mr. Huerta Estrada?

15         MS. BLAIR:  I, myself, Your Honor.  Elizabeth Blair,

16  Assistant Federal Public Defender.

17         THE COURT:  All right.  And who is here on Page 10,

18  Carlos Duran Hernandez?

19         MS. PINERA-VAZQUEZ:  Good afternoon, Judge Goodman,

20  Sylvia Pinera on behalf of Mr. Duran, who is standing to my left

21  with the aid of the interpreter.

22         THE COURT:  Thank you.  So we're going to follow the

23  procedure that we discussed this morning.  We're going to, in

24  effect, combine the two cases, and when the Government puts the

25  Agent on, I'll give both the lawyers the opportunity to examine

1    the Agent.  But hopefully you won't be repeating points that

2    your colleague has already made.

3          So just tell me quickly, Mr. Abraham, first for

4    Mr. Huerta Estrada, the grounds upon which you're seeking

5    pretrial detention?

6          MR. ABRAHAM:  Flight and danger, Your Honor.

7          THE COURT:  Is this also a presumption case?

8          MR. ABRAHAM:  It is, Your Honor.

9          THE COURT:  So three grounds?

10          MR. ABRAHAM:  Yes, Your Honor.

11          THE COURT:  All right.  And that's for both?

12          MR. ABRAHAM:  That's correct.  For both Defendants.

13          THE COURT:  All right.  Give me your factual proffer

14    please.

15          MR. ABRAHAM:  Yes, Your Honor.

16          On or about February 16, 2019, these two Defendants

17    were found in international waters onboard a small fishing

18    vessel with approximately 2,200 kilograms of cocaine.  A US

19    Government airplane was on patrol, detected this fishing vessel

20    stopped approximately 308 nautical miles southwest of the

21    nearest point of land which was Zihuatanejo, Mexico.  The vessel

22    had two outboard engines, approximately 30 feet long.  Had a

23    blue tarp covering the deck at the point that it was observed by

24    the US Government airplane.

25          The US Coast Guard Cutter *Steadfast*, a large boat who

1    was several nautical miles away.  The airplane communicated for

2    that Coast Guard Cutter to come and try to intercept this boat,

3    this boat with these Defendants.  The Coast Guard Cutter

4    launched a smaller boat with the crew of US Coast Guard officers

5    on it, and they set out towards this boat, which I'll just call

6    a target of interest, try to keep this simple.

7            At some point, the first airplane that had seen the

8    boat ran out of fuel and had to return and stop patrolling.  So

9    a second airplane gained a visual of these three men on the boat

10   and confirmed from its last known position in communicating with

11   the first airplane that this was the first vessel, and it

12   observed again the blue tarp covering the deck, the two outboard

13   engines and now at this point, they could tell there were three

14   crew members onboard.

15           The smaller boat, Coast Guard boat gained positive

16   control of the target of interest, the vessel without the use of

17   force.  While this -- when I say gained positive patrol, they

18   came alongside, the vessel was stopped.  At this point, the

19   Government airplane saw another boat, a second open-style

20   fishing vessel approximately 30 nautical miles away from this

21   first boat with these three Defendants, two of which are here

22   right now.  Two of the Defendants.

23           At that point, the Coast Guard Cutter *Steadfast*

24   directed one of its smaller boats to try to intercept this

25   second boat, find out what it was doing.  That vessel had --

1    that other vessel had three other men onboard, two outboard

2    engines.  It had a tarp covering 75% of its deck and fuel

3    barrels onboard.  That other vessel, which I'll call target of

4    interest two which did not have these men on it, started to flee

5    north at 25 nautical miles per hour.  One of the Coast Guard

6    boats started chasing that boat and when it was about a thousand

7    yards away from that other boat, that boat began dumping

8    packages into international waters.  That other boat, which did

9    not have these three defendants, began to outrun the Coast Guard

10    boat, so at that time, the Coast Guard boat that was next to

11    these three Defendants and their boat joined the chase to try to

12    catch the other boat.  Ultimately, the other boat that was

13    dumping packages gets away.

14        At that point, the Coast Guard returned their focus to

15    this boat with these two Defendants and the third man.  They

16    found that there was no markings of nationality, there was no

17    flag, no registration documents, no registration number on the

18    hull, no home port on the hull, et cetera.  They found

19    Mr. Huerta Estrada, a Mexican national, he was determined to be

20    master of the vessel.  He did not make a claim of nationality

21    for the vessel.  There were other two crew members, Mr. Duran

22    Hernandez, also a Mexican national, and a third individual

23    Mr. Marin Amaya, a national of Guatemala.

24        The Coast Guard made right visit questioning at this

25    time.  They asked the purpose of the voyage.  The crew told them

1   that they were fishing.  The Coast Guard observed that there was

2   no fish onboard, no bait.

3       As the Coast Guard came up on their vessel, I didn't

4   mention this part, the crew was moving the tarp that was on the

5   vessel, and that tarp actually got caught in the propeller and

6   as the tarp moved, the Coast Guard could see that there were

7   packages that appeared to be drugs onboard the vessel.

8   Ultimately, the Coast Guard communicated with their commanders

9   in California in District 11, they got authority to treat the

10  vessel as a stateless vessel.

11      Once they had authority to do that, they conducted a

12  full law enforcement boarding which includes them taking samples

13  of the substance inside the packages.  The samples tested

14  positive for cocaine.

15      Ultimately, onboard this 30-foot fishing vessel with

16  two outboard engines they recovered 110 bales or packages of

17  cocaine that had a total at-sea weight of approximately 2,200

18  kilograms.

19      The two men were detained, taken into custody.  The

20  Coast Guard transported them to California.  They had initial

21  appearances in California and then now have been transferred

22  here on this indictment.

23      That concludes the proffer, Your Honor.  Special Agent

24  Adam Snyder from the Drug Enforcement Administration is here.  I

25  apologize that he does not have a button down shirt, but he does

1   have a jacket.  Due to the last minute notice, we were not able

2   to get him with a suit with a button shirt and tie, so I do

3   apologize for that.

4            THE COURT:  I'm sure Agent Snyder doesn't mind.

5            Angela, can you pass up the pretrial services reports,

6   one for Mr. Duran Hernandez -- actually we have them left over

7   from this morning, Tammy?  All right.  Thank you very much.

8            So we have -- so Agent, come on up to the witness stand

9   please.

10           COURTROOM DEPUTY:  Please raise your right hand.  Do

11  you solemnly swear (inaudible).

12           Please state your name (inaudible).

13           THE WITNESS:  Adam Snyder.  A-D-A-M, S-N-Y-D-E-R.

14           THE COURT:  Have a seat, sir.

15           And by the way, is that your jacket or a borrowed

16  jacket?

17           THE WITNESS:  This is a borrowed jacket.

18           THE COURT:  Aha.  I suspected as much.  And borrowed

19  from an AUSA or from a fellow DEA Special Agent?

20           THE WITNESS:  From a DEA intel supervisor.  He gave me

21  the shirt off his back.

22           THE COURT:  I see.  The jacket off your back.  I

23  understand.  So for no other reason than this is the order that

24  the cases are in, pages nine or ten, Ms. Blair on behalf of your

25  client as to Mr. Huerta Estrada, you may inquire first.

1            MS. BLAIR:  Thank you, Your Honor.

2                      CROSS-EXAMINATION

3       BY MS. BLAIR:

4       Q.  Good afternoon, Mr. Snyder.

5       A.  Good afternoon.

6       Q.  Did you have a chance to look into the Government's proffer?

7       A.  Yes, I did.

8       Q.  Do you adopt that proffer as your own?

9       A.  Yes, I would.

10      Q.  Would you make any changes, any deletions or additions?

11      A.  Nothing that I recall.  It sounded very accurate.

12      Q.  In preparing for this hearing, did you have a chance to

13      review any documents?

14      A.  Yes, I did.

15      Q.  And what documents did you review?

16      A.  I reviewed reports, post-Miranda reports that were written.

17      Also crew member statements provided by the Coast Guard.

18              What's that?  I'm sorry.

19      Q.  Where -- are the crew member statements written?

20      A.  Yes.

21      Q.  Anything else?

22      A.  Not that I recall.  I believe that was it.

23      Q.  All right.  So I want to talk to you about those

24      post-Miranda statements as well as some other statements, okay?

25      A.  Okay.

1    Q.  My understanding is that when the Coast Guard first boarded

2    the vessel, they were only supposed to ask certain questions

3    about where the vessel was coming from, things like that; is

4    that right?

5    A.  Yes.

6    Q.  Do you have any information in this case about whether

7    Mr. Huerta Estrada made any statements to the Coast Guard?

8    A.  I don't know who exactly made the statements.  I just have

9    essentially what the crew members put down in their report as

10   what they stated, presumably from the questions that they asked.

11   Q.  Are you saying that you don't know which Defendant made

12   which statement or -- I'm sorry?

13   A.  Yeah.  I'm saying that the information that was given to me

14   by or that was written down, I don't know necessarily which

15   person provided that.  Just that it was written down by the crew

16   members from the Coast Guard.

17   Q.  And what information was that that was written down?

18   A.  They had the different nationality.  They did have in there

19   that somebody had stated that they were -- it was a fishing

20   vessel.

21   Q.  Anything else?

22   A.  Nothing that I recall besides -- I mean, they also put their

23   observations and what they did.  But as pertaining to questions

24   that they asked, I believe that's about it.

25   Q.  Do you know if Mr. Huerta Estrada made any statements to the

1   Coast Guard while they en route back to the US?

2   A.  I do not know.

3   Q.  What about once Mr. Huerta Estrada reaches the United

4   States?

5   A.  Once he reached the United States, I know that he did --

6   there was an interview conducted by DEA.

7   Q.  And do you know the contents of that interview?

8   A.  I've looked over the report.

9   Q.  And what did Mr. Huerta Estrada say during that interview?

10  A.  He had said that -- how he had been approached to go out and

11  essentially retrieve, not necessarily cocaine, he was originally

12  kind of posed as this was going to be a rescue mission.  They

13  were going to rescue, presumably, some people.

14          He was then flown to a city, I believe it was Guerra,

15  Mexico, but I'd have to re-look at the notes, but he was

16  essentially flown, then he was put on a vessel, and I believe he

17  was told that they're going roughly around 200 miles, nautical

18  miles, off the coast of Mexico, and they traveled approximately

19  500.  I believe the distance was changed on them.

20          At that point, they asked why they were going out

21  there, and they were told don't ask questions.  And at this

22  point, they then indicated that they knew that they were going

23  out to pick up cocaine.

24  Q.  Did they know that they were going out to pick up cocaine

25  just because that's what they assumed, or did he say that

1   someone told him that?

2   A.  It does not say in the report, so I can't answer that.

3   Q.  When you're talking about "they", you're talking about

4   Mr. Huerta Estrada and the two co-defendants or someone else?

5   A.  I'm speaking specifically about these two Defendants from

6   reading the reports.

7   Q.  And were you one of the agents who interviewed Mr. Huerta

8   Estrada?

9   A.  No, I was not.

10  Q.  I want to also ask you about the statements from the third

11  codefendant, Mr. Douglas Marin Amaya.

12  A.  Okay.

13  Q.  Do you know what statements, if any, that Mr. Marin Amaya

14  made?

15          MR. ABRAHAM:  Objection, Your Honor.  I think this is

16  beyond the scope of the detention hearing and not relevant.

17          THE COURT:  Overruled.

18          THE WITNESS:  I did have a chance to review that.  It

19  was similar.  I believe Mr. Amaya was out shopping, I believe

20  with his wife, and he was approached by somebody to do a job.

21  Again, it was sold, I guess, as a rescue mission.

22          He was then taken somewhere else to a house, and then

23  eventually he was put on a vessel and before -- or at some point

24  either when he was at the house or on the vessel going out to

25  sea, he realized that he was, in fact, going out to retrieve

1 cocaine and not going out to rescue people.

2  BY MS. BLAIR:

3 Q. Okay.  Does Mr. Marin Amaya say anything else that you

4 recall?

5 A. I'm sure there may be other things.  That was the relevant

6 from what I recall.

7 Q. I want to talk a little bit about the vessel in this case.

8 My understanding is there's two boats, so I'll call it target of

9 interest one, which you believe Mr. Huerta Estrada was on and

10 then the second boat target of interest two; is that fair?

11 A. Sure, yes.

12 Q. How far away from the United States was target of interest

13 one when it was first spotted?

14 A. I do not know.

15 Q. Do you know if the target of interest one boat was moving

16 when it was first spotted?

17 A. I believe it was not moving.  That's the indication I got

18 from reading the crew members' reports.

19 Q. In the Government's proffer, they talked about two different

20 airplanes.  Do you know how long it was between when the first

21 airplane had to pull back and the second airplane was able to

22 spot the vessel?

23 A. I don't know the exact times.

24 Q. Do you have an estimate?

25 A. No, I don't.  It would be speculation on my part.

1    Q.  When target of interest two is located, is it moving towards

2    target of interest one, away from target of interest one or in

3    which direction?

4    A.  It was approximately 30 nautical miles away.  I don't

5    necessarily know the direction out on the water, which way it

6    was going, whether they're going east, west, north.  I don't

7    know.

8    Q.  Was there any other indication, aside from that they're

9    spatially close, that the two vessels were together?

10   A.  I don't know.

11   Q.  During the Government proffer there was also a mention that

12   Mr. Huerta Estrada was determined to be the master of the

13   vessel.  How was that determination made?

14   A.  I don't know.  Normally it would be -- they indicated to the

15   Coast Guard that I am the master of the vessel, but I don't

16   specifically know how they knew that he was the master or the

17   captain of it.

18   Q.  So you don't know whether -- in this case whether it was

19   Mr. Huerta Estrada?

20   A.  Correct.

21   Q.  Do you know if anyone ever saw Mr. Huerta Estrada pilot the

22   boat?

23   A.  I do not know.

24   Q.  Do you know if anyone else saw any of the other

25   co-defendants pilot the boat?

1    A.  I do not know.

2    Q.  Do you have any information that Mr. Huerta Estrada resisted

3    arrest in any way?

4    A.  Not that I'm aware of, no.

5    Q.  And why did this case first initially go to California?

6    A.  I believe that was the first stop that the Coast Guard

7    Cutter *Steadfast* was making, so that's why they went to

8    California.

9            MS. BLAIR:  Just one moment please, Your Honor.

10           I have no further questions.  Thank you.

11           THE COURT:  Thank you.  Before we -- excuse me.  Before

12   we get to Ms. Pinera, do you have any additional information,

13   Mr. Abraham, that you would like to bring out through this

14   witness concerning Mr. Huerta Estrada?

15           MR. ABRAHAM:  Your Honor, can I do redirect after the

16   second cross?  Or are you saying this is my chance to redirect

17   for this Defendant?

18           THE COURT:  I'm saying this is your opportunity now.

19   I'm not saying you'll never have another opportunity, but we're

20   trying to just, at least in my mind, compartmentalize.  So do

21   you have any additional questions for this witness concerning

22   Gaspar Huerta Estrada?

23           MR. ABRAHAM:  Sure, Your Honor.  Just very briefly.

24                       REDIRECT EXAMINATION

25       BY MR. ABRAHAM:

1    Q.   Special Agent Snyder, do you recall that I stated that

2    target of interest two fled at the time that it was spotted,

3    right?

4    A.   Yes.

5    Q.   And you also recall that after target of interest two

6    started to flee, that the boat that was -- the Coast Guard boat

7    that was near these Defendants joined in the chase and tried to

8    catch the other boat, target of interest two.  Do you recall

9    that right?

10   A.   Yes.

11   Q.   The Defendant's post-Miranda statements about being hired

12   for a rescue mission, those statements were made approximately

13   two and a half weeks after they were detained by the Coast

14   Guard, right?

15   A.   Yes, that sounds correct.

16   Q.   And do you know if these three men that were captured on

17   this boat with the 2,200 kilograms of cocaine had an opportunity

18   to speak to each other before the DEA spoke with them on March

19   30, 2019?

20   A.   Based on the set-up of the Coast Guard boat, a lot of times

21   they are kept in close quarters or right next to each other, so

22   oftentimes they do have that opportunity.

23   Q.   Okay.

24          MR. ABRAHAM:  Thank you, Your Honor.

25          THE COURT:  Thank you.  Ms. Pinera, on behalf of Carlos

1   Duran Hernandez, do you have questions for the Agent?

2          MS. PINERA-VAZQUEZ:  I do, Your Honor.  And Ms. Blair

3   did a real good job, so I'm not going to repeat -- try not to

4   repeat --

5          THE COURT:  Maybe she'll say the same nice things about

6   you.

7          MS. PINERA-VAZQUEZ:  -- any of the questions.

8                        CROSS-EXAMINATION

9   BY MS. PINERA-VAZQUEZ:

10  Q.  Agent Snyder, you said that there were two planes that went,

11  I guess, out of the Coast Guard Cutter *Steadfast*; is that right?

12  A.  I believe that's correct.

13  Q.  And the two planes, they went out on different occasions

14  because one ran out of fuel?

15  A.  I believe that is correct, yes.

16  Q.  Okay.  And are these airplanes, are they equipped with video

17  monitoring devices?

18  A.  I believe they are.

19  Q.  So do you know whether or not this entire episode was video

20  taped?

21  A.  I believe it was.  I have not seen video of that though.

22  Q.  And each plane had obviously separate video equipment,

23  right?

24  A.  I believe so, yes.

25  Q.  Now, you also, I believe, testified that there were two

1    boats.

2    A.   Correct.

3    Q.   Is it fair to call them pangas?

4    A.   Sure.

5    Q.   Now, these two pangas, when was the first time that they

6    both started being monitored?

7    A.   I don't have the exact time.  It was earlier, I believe, on

8    that February 16th day.

9    Q.   Well, my question is did you at any time have any

10   information that both boats were seen at the same place at the

11   same time?

12   A.   No.

13   Q.   In other words, do you have any information as to whether my

14   client, Mr. Duran, may have been on the other boat that was

15   heading north?

16   A.   No, I don't have any information.

17   Q.   In other words, you don't have any information as to whether

18   Mr. Duran was somehow just placed on this boat in the middle of

19   the ocean with the drugs, right?

20   A.   I believe he was taken out on a boat and then he was ordered

21   to go ahead and offload from another boat, the cocaine, on to

22   the boat that he ultimately ended up on.

23   Q.   And how do you formulate that opinion?  Where do you get

24   that information from?

25   A.   From the post-Miranda statement.

```
1    Q.  The post-Miranda statement of Mr. Duran.

2    A.  From both of them, yes.

3    Q.  From both Defendants here today.

4    A.  Yes.

5    Q.  So that second boat, was that ever identified or the

6    individuals on that second boat ever caught?

7    A.  No, they were not.

8    Q.  Now, I believe the proffer was that the boat that Mr. Duran

9    was on was stopped 308 nautical miles from the Mexican coast; is

10   that right?

11   A.  Yes.

12   Q.  Was the boat stopped?

13   A.  It's my understanding that yes, the boat was stopped, it

14   wasn't moving and then they took that -- the tarp off that was

15   mentioned, and that got caught up in the propellers of that

16   boat.  And then they did try to go ahead and flee as the Coast

17   Guard was approaching, but because that tarp essentially got

18   tangled into the propellers of the engine, they weren't able to

19   go anywhere.

20   Q.  Well, you just used the words that they attempted to flee.

21   How do you get to the conclusion that they attempted to flee?

22   A.  During one of the crew member's statements, they said as

23   they approached, they saw somebody, they don't clarify who, was

24   jamming the throttle forwards and backwards on the boat,

25   essentially trying to put it in gear or give it some sort of
```

1    power to move the boat.

2    Q.  When the -- in the reports that you've read in preparation

3    for this hearing, do you have any information as to whether or

4    not the Coast Guard personnel that approached the panga had a

5    Spanish speaker on there?

6    A.  They typically do.  I believe that they do here, but I'm

7    uncertain.  I don't know what type of language -- I'm assuming

8    that somebody on that boat spoke Spanish.

9    Q.  All right.  But you don't know for sure.

10   A.  Correct.

11   Q.  So you don't know whether or not Mr. Duran, who only speaks

12   Spanish, understood what was -- what they were asking him,

13   right?

14   A.  I would not know.

15   Q.  And you're (inaudible) Mr. Duran actually told the personnel

16   that they had basically been kidnapped on this rescue mission,

17   right?

18   A.  I don't know.

19   Q.  And do you have any information from the day that he was

20   taken into custody on February 16th to March, I believe, 3rd

21   when he made his first appearance in California, whether or not

22   he actually approached personnel in the Coast Guard Cutter to

23   explain what had happened?

24   A.  I do not know.

25   Q.  And as far as when he was transported between March 3rd and

1   as we sit here today, April 4th, do you have any information as

2   to whether or not he actually went and explained his story that

3   he had been kidnapped and he was supposed to do this rescue

4   mission and ended up on a drug boat without being able to get

5   out.  Do you have any information?

6   A.  He was interviewed.  I believe I have the report, I can

7   check the date, but he was interviewed by DEA and I know that

8   their Spanish speaker would have interviewed him.

9   Q.  But you don't know if that's the first time he told DEA, he

10  might have told somebody else along the way, you just don't

11  know?

12  A.  To my knowledge, that was the first time he spoke to DEA but

13  --

14  Q.  By the way, why didn't this case stay in California?  Why

15  did it come to Miami?

16  A.  It's our investigation, it's a Miami-led investigation.

17          THE COURT:  Statistics, Ms. Pinera.  Statistics.

18          MS. PINERA-VAZQUEZ:  (Inaudible) shopping.

19      BY MS. PINERA-VAZQUEZ:

20  Q.  Do you know whether or not that second vessel had a flag or

21  was it attached, registration to any other country or anything?

22  A.  I don't believe any was seen, but because they didn't

23  ultimately stop the boat, I'm not certain on that.

24  Q.  What happened to the panga that Mr. Duran was on?

25  A.  It would have been sunk.

1   Q.  Do you know if it was sunk?

2   A.  Yes.

3   Q.  Do you know if any registrations were taken into custody by

4   the Coast Guard?

5   A.  I don't believe they were able to find any registration,

6   flags.  I believe they did take serial numbers off of the

7   engines.

8   Q.  And just the last area of inquiry is the statements.  You

9   said a short while ago that -- actually said two separate

10  things.  The first thing you said is that the crew said that

11  they were fishing.  And then at one point you said that it was a

12  fishing vessel.  Can you tell us which one of those statements

13  or is it both?  Can you just clarify that please?

14  A.  The Coast Guard lists it as a go-fast vessel.  I know

15  sometimes panga, go-fast vessel can be somewhat used

16  interchangeably, but it's my understanding they went ahead and

17  told the crew members that their purpose for being out there on

18  the water was fishing, and then it was notated that there was no

19  fish or fishing bait onboard.

20  Q.  That the individuals on the panga told the Coast Guard

21  personnel?  Is that what you're saying?

22  A.  The Defendants here.

23  Q.  Okay.  Because you said crew members.  I'm thinking crew

24  members, the Coast Guard is telling them that they're fishing?

25  A.  When I'm saying crew members, I'm meaning US Coast Guard.

1    But to be clear, they had told that to the US Coast Guard.

2    Q.   Do you know which of the Defendants said that?

3    A.   No, I don't.

4    Q.   And do you know whether that was said in Spanish, English?

5    Do you have any idea?

6    A.   I would assume in their language because they got that

7    answer.  But again, typically they will have somebody, a Spanish

8    speaker there.

9    Q.   And lastly about Mr. Amaya, which is a Guatemalan, right?

10   He's from Guatemala?  What did you say he was also put on a

11   plane?  I didn't really catch that at the end of what you said.

12   How did he come into this venture.

13   A.   He was approached while he was with his wife shopping and to

14   ultimately get to the boat with the Defendants here in front of

15   us, he was put on a plane and then eventually was driven and

16   taken to a boat.

17   Q.   And do you know whether or not Mr. Amaya knows any of the

18   two Mexican Defendants here?  Did they have any sort of

19   relationship before?

20   A.   I don't know if they had any previous relationship.

21   Q.   All right.

22        MS. PINERA-VAZQUEZ:  I have no further questions.

23        THE COURT:  Mr. Abraham, is there anything further that

24   you would like to bring out through this Agent concerning Carlos

25   Duran Hernandez?

1          MR. ABRAHAM:  Yes, Your Honor

2                        REDIRECT EXAMINATION

3     BY MR. ABRAHAM:

4     Q.  From your review of the crew statements, do you recall the

5     Coast Guard crew making any written statements about what any of

6     these three Central American nationals said?

7     A.  No, I don't.

8     Q.  Okay.  And the basis for you saying that somebody out of

9     three defendants indicated that the purpose of the voyage was

10    fishing is based on the Coast Guard paperwork you've reviewed,

11    right?

12          MS. PINERA-VAZQUEZ:  Objection, leading.

13          THE COURT:  Sustained.

14    BY MR. ABRAHAM:

15    Q.  What's your basis for your earlier testimony that somebody

16    on -- one of the three defendants said the purpose of the voyage

17    was fishing?

18    A.  On some of the Coast Guard documents that I reviewed, it had

19    it listed on there.

20    Q.  Okay.  And what's your basis for your testimony that no fish

21    or bait was retrieved from onboard the Defendant's vessel?

22    A.  That was listed on the Coast Guard document.

23    Q.  Okay.  And if I show you the Coast Guard time line, would

24    that refresh your recollection as to when the first plane and

25    the second plane observed the target vessels?

```
 1    A.  Yes, it would.

 2    Q.  Okay.

 3         MR. ABRAHAM:  Your Honor, permission to approach.

 4         THE COURT:  Yes.

 5         MR. ABRAHAM:  Sure.

 6         (Conversation between counsel not captured on audio)

 7         MS. PINERA-VAZQUEZ:  I can't understand Zulu time half

 8    the time.

 9         MR. ABRAHAM:  If we can mark that as Government's

10    Exhibit 1 for purposes of -- but I would just ask that you look

11    at it and then put the document away.

12         THE WITNESS:  Okay.

13         MS. PINERA-VAZQUEZ:  We don't object.  He can read from

14    the document.

15         THE COURT:  Well Agent, the question is does that

16    document refresh your recollection?

17         THE WITNESS:  Yes, it does.

18    BY MR. ABRAHAM:

19    Q.  Okay.  Now that your recollection has been refreshed, can

20    you tell us, in Coast Guard time, Coast Guard Zulu time, when

21    the first -- the Defendants' boat was followed by the airplane?

22    A.  16:12:44 Zulu time.

23    Q.  And was that by the first airplane or the second airplane?

24    A.  That was the first airplane.

25    Q.  And when did an airplane spot the second target of interest,
```

1    the boat that got away?

2    A.   I'm going to go ahead and look at the document.  At 13:14

3    Zulu time.

4    Q.   And just to clarify the record, were the two airplanes that

5    we talked about today, were they launched from the Coast Guard

6    Cutter *steadfast*?

7    A.   I believe they were.

8    Q.   Okay.  And were they marine patrol aircraft; is that right?

9    A.   Yes.

10   Q.   Okay.

11          MR. ABRAHAM:  Your Honor, I don't have any further

12   questions.

13          THE COURT:  Thank you.  Agent, you may step down.

14          So I'll entertain argument first from the United States

15   and to the extent, Mr. Abraham, that your comments relate to

16   both Defendants, just make the arguments and then if you have

17   any arguments that are uniquely applicable to one Defendant as

18   opposed to another, let me know that, all right?

19          MR. ABRAHAM:  Yes, Your Honor.

20          So my arguments are to both Defendants.  The Government

21   has established danger based on the nature of the offense, the

22   large amount of cocaine that was found onboard the boat with

23   these two Defendants.  The 2,200 kilograms of cocaine is a huge

24   quantity. This is in international waters on a stateless vessel,

25   several hundred nautical miles away from land.

```
 1          THE COURT:  By the way, let me ask you this question.

 2   Under the advisory sentencing guidelines, how much time is each

 3   Defendant facing?

 4          MR. ABRAHAM:  They're facing, Your Honor, 133 -- excuse

 5   me. 135 to 168 months imprisonment based on the --

 6          THE COURT:  Amount of the drugs?

 7          MR. ABRAHAM:  -- amount of the drugs being over 450

 8   kilograms.  That is with the benefit of a two level safety valve

 9   and three points off for acceptance of responsibility.  They are

10   eligible for safety valve, so if they satisfy safety valve, the

11   judge would be able to sentence them below ten years.

12          The post-Miranda statements of the Defendants

13   themselves admit that their mission was to go out and take drugs

14   on their boat for payment.  They say at the beginning that they

15   were hired for a rescue mission, and only learned it was of

16   drugs shortly before their trip.  Ultimately, they admitted they

17   knew they were being paid to do this.  Whatever their possible

18   duress defense may be at trial is not relevant here to

19   detention.  The Government has still established danger.

20          As far as a flight risk, both of these men were brought

21   to the United States, paroled here for purposes of standing

22   trial to this charges.  There are immigration detainers in

23   place.  One of the individuals, I don't want to misstate this,

24   Mr. Huerta Estrada, tells Probation that he was in the United

25   States from 2007 to 2011.  That being said, Mr. Estrada has no
```

1    ties in the United States.  He lives in Mexico, all his family

2    is in Mexico.  There's an immigration detainer in place, so he's

3    a flight risk.  I submit, Your Honor, the Government has carried

4    the burden of the preponderance of the evidence.

5           Mr. Hernandez, based on the Pretrial Services Report,

6    has never been to the United States.  He has no family ties here

7    to the United States, and his family is also in Mexico, and he

8    also represents a flight risk.

9           THE COURT:  Thank you.

10          So now we'll hear defense argument first on behalf of

11    Mr. Huerta Estrada.

12          MS. BLAIR:  Yes, Your Honor.  We will rest on the

13    Pretrial Services Report.

14          THE COURT:  Ms. Pinera, on behalf of your client?

15          MS. PINERA-VAZQUEZ:  Likewise, Your Honor.

16          THE COURT:  All right.  Thank you.

17          So Mr. Abraham, I'm going to grant your request for

18    pretrial detention for both Defendants, but you may want to take

19    good notes because I'm going to be requiring you to submit

20    proposed pretrial detention orders as to both.  You'll need a

21    separate pretrial detention order as to each Defendant and

22    please use the expandable AO form.  I think you know the one

23    that I'm --

24          MR. ABRAHAM:  Yes, Your Honor.

25          THE COURT:  -- referencing, and get that into my e-file

1    inbox by the end of business tomorrow.

2              So, I note that both of these cases have already been

3    indicted, so there's already probable cause that has been

4    established and the -- perhaps if the case goes to trial, it

5    might be an interesting trial given the testimony that these

6    gentlemen say that they were told one thing and then suddenly

7    they found themselves aboard a boat and surprise, surprise,

8    there was cocaine on it and maybe that presentation will work

9    with a jury, who knows.  But for present purposes, I have a

10   grand jury who has already established the probable cause

11   through the indictment.

12             In addition, I note that this is a statutory

13   presumption case and the grand jury, through its indictment, has

14   already established probable cause that the statute triggering

15   the presumption has, in fact, been violated, and neither

16   Defendant has introduced any testimony or persuasive argument to

17   demonstrate that they have rebutted the presumption.  So I could

18   simply stop there, but in order to make a more complete record,

19   I'm also going to find that both of the Defendants are a flight

20   risk.  They are both facing a very significant amount of federal

21   prison time, between 135 to 168 months.  Neither of them have

22   any -- neither of them has any ties to the United States.  They

23   are citizens of another country.  They don't appear to own any

24   property here in the United States.  All of their relatives are

25   in another country.  And so for all of those reasons, I conclude

1   that they are a flight risk as well.

2       I don't need to get into the issue of danger to the

3   community.

4       So based on those two reasons, statutory presumption

5   and risk of flight, I'm going to grant the Government's

6   detention request.

7       Anything further from either side this afternoon

8   concerning either Mr. Huerta Estrada or Mr. Duran Hernandez?

9       MR. ABRAHAM:  Your Honor, so just to clarify, you're

10  denying -- we did not meet our burden on danger?

11      THE COURT:  I didn't say that.  I'm not discussing it

12  because I don't need to.

13      MR. ABRAHAM:  Very well.

14      THE COURT:  I wouldn't put it in the loss column, I

15  would simply say not addressed.

16      MR. ABRAHAM:  All right.

17      THE COURT:  All right, folks.  We'll be -- yes, Tammy?

18  I think we arraigned him this morning, didn't we?

19      MS. PINERA-VAZQUEZ:  No, we did not arraign him.

20      THE COURT:  We did not.

21      MS. PINERA-VAZQUEZ:  We can proceed to arraignment.

22      THE COURT:  Okay.  Thank you, Tammy.  Let's go on Page

23  9.  We have Gaspar Huerta Estrada.  So Ms. Blair, let's move

24  forward on the arraignment.

25      MS. BLAIR:  Yes, Your Honor.  We received a copy of the

1    indictment, we waive the formal reading, we enter a plea of

2    guilty, we ask for a trial by jury and we ask the Court enter

3    the standing discovery order.

4              THE COURT:  Thank you.  The not guilty plea is duly

5    noted.  The standing discovery order has been up or soon will be

6    up.  Judge Moreno has the case.  Thank you very much.

7              Ms. Pinera, your case which is Page 10, Mr. Duran

8    Hernandez.

9              MS. PINERA-VAZQUEZ:  Yes.  On behalf of Mr. Duran

10   Hernandez, we enter a plea of not guilty, waive a formal reading

11   of the indictment, demand a trial by jury and request that the

12   standing discovery order be entered.

13             THE COURT:  Thank you.  Not guilty plea is duly noted,

14   standing discovery order is up or will be up.  You'll be hearing

15   from Judge Moreno.

16             Thanks folks.

17             Now, I understand we also have a grand jury matter; is

18   that correct?  All right.

19             (PROCEEDINGS CONCLUDED)
                         *  *  *  *  *
20
                    C E R T I F I C A T E
21   I certify that the foregoing is a correct transcript from the
     digital audio recording of proceedings in the above-entitled
22   matter.

23   6/7/2019              /s/ Dawn M. Savino
     Date                  DAWN M. SAVINO, RPR
24
                        I N D E X
25

1                           **WITNESSES**

2      ALL WITNESSES:                              PAGE:

3      For Government:

4        Adam Snyder:
          Cross-Examination by Ms. Blair           8:2
5         Redirect Examination by Mr. Abraham      14:24
          Cross-Examination by Ms. Pinera-Vazquez  16:8
6         Redirect Examination by Mr. Abraham      23:2

7                           **EXHIBITS**

8      None
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**PROCEEDINGS RECORDED BY DIGITAL AUDIO RECORDING**
**TRANSCRIPT PRODUCED BY MANUAL STENOGRAPHY**
**AND COMPUTER-AIDED TRANSCRIPTION**